First case on our call this morning is Agenda Number 3, Case Number 104723, People of the State of Illinois v. Lewis Jackson. Good morning, Your Honors. May it please the Court, my name is Carol Gaines and I represent the people of the State of Illinois. On November 2nd of 1995, 59-year-old Doris Jackson was brutally stabbed to death in the bedroom of her apartment in the senior citizen building in which she lived. Doris was a stroke victim who was partially paralyzed on the right side of her body. At the time of her murder, the defendant, Doris's nephew, had been kicked out of his home by his own mother and had been living with Doris for several weeks. The lobby of her building was only accessible with a key and the door to each apartment automatically locked when it was closed. Only Doris and her ex-husband, also Lewis Jackson, had keys to both the lobby door and her apartment door. The day before her murder, her ex-husband, Lewis Jackson, took Doris to cash her public aid check and pay her bills. Doris was generally left with $100 in cash, which she would put in her bra strap. The defendant knew that that's where his aunt kept her money. At 7 a.m. on the morning of her murder, Doris's daughter, Cassandra Jackson, phoned her mother but was not concerned when she didn't answer because she knew her mother frequently went downstairs to have coffee. At 7.30 a.m., Doris was seen in the recreation room of her building by a neighbor, Kenneth Jackson. Later, between 9 and 10 a.m., the building's maintenance man, Willie Stewart, saw a defendant enter the building and open Doris's mailbox, both of which would have required the defendant to use a key. At 3 o'clock, Doris's daughter, Cassandra, returned to her building, rang the buzzer but received no answer. At 3.30 that afternoon, Kenneth Jackson, the same neighbor, saw a defendant in the hallway outside of Doris's apartment walking away. Just after that, the defendant was seen outside the building asking for a ride to a currency exchange and coming back into the building using a key. At 6 p.m. when Cassandra returned to the building to try and see her mother, she became concerned when she again received no response from her mother's apartment. The maintenance man let her into the building and let her into Doris's apartment. The first thing she noticed, it was unusual. The window was open and it was cold. The TV in the living room was missing and she walked into Doris's bedroom and found her mother laying on the bedroom floor, surrounded by blood. She had been stabbed 30 times in the chest, arms, hands, ribs, and lungs. There was no forced entry into her apartment. There was no sign of struggle leading to her bedroom where the walls, floor, and bedding were bloody. A bloody knife blade was found on her bed and the television from her bedroom was missing as well. In the bathroom, there was a bloody crumpled dollar bill and droplets of blood in the toilet bowl and on the tub. Cassandra found a damp washcloth, a black t-shirt, and a pair of jeans in Doris's hamper. Defendant returned to Doris's apartment later that night at about 1 a.m. The sound of jiggling of keys was heard outside her apartment door and they heard a noise when Cassandra's boyfriend, Shannon Frazier, went to the door and saw a defendant walking away. Defendant was told that his aunt had been murdered and he voluntarily went to the Harvey Police Department where defendant immediately proceeded to dump Doris's keys into a trash can in the restroom. Defendant spoke with Detective Rizzi at the Harvey Police Department. When defendant was signing a waiver of rights form, Detective Rizzi noticed that the defendant had cuts on the palms of his hands. Assistant State's Attorney, Frank Ceci, noticed those same cuts the following day when he spoke with the defendant. Defendant was taken into custody and told various stories about his whereabouts on the night before and the day of his aunt's murder. In the first story, the defendant said he was partying with a neighbor upstairs. He returned to her apartment at 10 in the morning. The door was locked and he went out for the rest of the day and partied with his friends, returning to find his family there at 1 a.m. In a second story, the defendant said he was partying with friends, the same friends. He went to her apartment at 3 a.m. He found the door unlocked, didn't see her there. He grabbed a coat and left. In his third story, the defendant admitted that he had entered the victim's apartment between 9 and 10 in the morning. He saw that the television was missing. He discovered his aunt on the floor with blood all over her. He admitted touching her body, trying to roll her over, and washing the blood off of his hands in the bathroom. He didn't call anybody. He didn't call for any help. He left the apartment, again, according to him, leaving the door unlocked. He returned there 30 minutes later, didn't know what to do, and left again. In his final story, he said that he entered Doris's apartment that morning and blacked out. When he awoke, he found her murdered body. And again, admitted touching her body, rolling her over, washing his hands, changing his clothes, taking her keys, and then leaving. At that time, felony review declined to approve charges pending further investigation. The defendant was released. A forensic expert at that time then tested the knife blade, the bloody dollar bill, the swabs from the toilet and the tub, and did find the presence of human blood. Her request for a blood standard from the suspect went unanswered by the Harvey Police Department. Fast forward almost six years. In May of 2001, DNA expert Lyle Boykin was asked to conduct a DNA analysis of the blood samples recovered from Doris's bathroom. He examined Doris's own blood standard, the blood stains from the tub and the toilet, the knife blade, the crumpled dollar bill, and the blue bed sheet. The DNA samples from the knife and the dollar bill and the bed sheet matched Doris's. But he also found that the DNA profile from the tub and the toilet stains were inconsistent with Doris's profile, but consistent with a male profile. He then uploaded that unknown profile into what was called a database and received a match which provided a reference number. He called Springfield, gave the reference number to a CODIS administrator who referenced that number and informed Mr. Boykin that the unknown profile, in fact, belonged to the defendant. In October of 2001, the defendant was arrested. In November of 2001, the defendant, following his arrest, gave a buckle swab, from which Boykin later confirmed that the DNA profile from the bathroom in Doris's apartment did, in fact, match the defendant's DNA. As it relates to Boykin's proposed testimony, prior to trial, the defendant moved, filed a motion in limine to preclude any evidence of his prior conviction for criminal sexual assault. In 1998, the defendant had a conviction because of his conviction for criminal sexual assault. The defendant was required to submit a DNA, a blood sample, to be placed in a database. At that time, at the time of the motion in limine, the prosecutor indicated to the trial judge he would only be asking Boykin very limited questions about how he came to identify the sample with respect to the database. He tested the material. He didn't have a sample. He placed it into a database and received a hit. The prosecutor explained to the trial judge the purpose in eliciting this evidence was to explain to the jury how defendant's DNA came to match the samples from Doris's apartment and explain the five year time lapse between the initial testing and the defendant's subsequent arrest. The trial judge at that time considered the arguments made by the parties, made the determination that people could only present that the match came from a database, nothing else. No testimony about the database, no facts about the database. Was the term CODIS ever used in front of the jury? Yes, it was. What does that term stand for? Combined DNA indexing system. At the time, the trial judge- Any request for a limiting instruction? There was not. There was not. At the time, the trial judge ruled on the motion in limine. He specifically limited the testimony so that absolutely no prejudicial references to the defendant's prior conviction would be made in front of the jury. The trial judge saw it as- Did the state offer a instruction? No. No. And the state indicated to the trial judge that it had absolutely no intention, and in fact never did, of presenting any kind of evidence, argument, reference at all to the defendant's prior conviction. Nothing was mentioned during trial about it. The question was about instructions. Did the state offer an instruction? With respect to the database? Yes. No. Consistent with the trial judge's ruling limiting the testimony, Boykin then did testify in front of the jury, as I said, that he had developed a male profile from the stain in the toilet and the tub. He uploaded it into a database. He obtained a match. It gave him a reference number from which he called Springfield. He spoke to a CODIS administrator, and that database administrator looked up the reference number and informed him that it had- Was that evidence in the presence of the jury? I'm sorry? Was that evidence in the presence of the jury? Yes, it was. How did he refer to the person in Springfield? As an administrator. There was absolutely no reference in Lyle Boykin's testimony to anything criminally related. He didn't say, I called the Illinois State Police. He didn't say, I called the crime lab. He didn't say, he didn't say anything. There was no criminal inference from the testimony given by Lyle Boykin at this trial. He used the word simply, database, DNA, reference number, CODIS administrator. It could have been anything. It was no reference to any kind of crime lab. Ms. Gaines, why should an expert's reference to a DNA evidence from the CODIS database be equivalent to fingerprint databases, as you mentioned in the cases? Well, I think a few reasons. Number one, a fingerprint database has the same thing. The fingerprint database contains information of unidentified fingerprints that can lead to an identification just as a CODIS database does. But don't fingerprint databases have non-criminal fingerprints? And so do CODIS databases. Do they contain non-criminal? Yes. DNA? Yes. A CODIS database consists of a forensic index, a convicted offender index, a missing persons index, relatives of missing persons index, and an unidentified human index. So there are other indexes in a CODIS database similar to a fingerprint database. But non-criminal? Non-criminal. Absolutely. Absolutely. Ms. Gaines? Yes. And this question will be for Ms. Firebaugh as well, but back to the fingerprints. I believe the defendant's position is that jurors would have a better understanding that fingerprints could be used for non-criminal activity where the DNA, at least in the minds of the jurors per the defendant, could only be used for criminal activity. And was there anything to support that? Is that just argument by the defense? Absolutely. That's just argument to the defense. The problem with the relatively, not the problem, but part of this being a relatively new process, is that there is no case law in Illinois addressing it. Is it accurate that the appellate court indicated that they believe, that the general population believe, that a DNA database would be related to criminal cases? No, I don't think it's accurate at all. In fact, it was pure speculation. Did they say that? Yes, they did say that. They did say that there, because the appellate court felt that there was little else in a DNA database. There was no evidence relative to the composition of any database. Not at all. One way or the other. Correct. And that's exactly what the trial judge intended to do, was to limit that testimony so that there was no reference to the contents of that database, so that the jury would not speculate, assume, believe that the only thing in that database was the only reason that a person's genetic makeup would be in a database, was because of a prior criminal case. What's the standard of review? The standard of review is whether or not the trial judge abused his discretion in allowing this evidence. And based on the argument of the defendant and what Justice Fitzgerald pointed out that the appellate court found, there were no studies, this was only argument and then at least opinion by the appellate court. Correct. Right. And what the trial judge, when you're looking at the trial judge's exercise of discretion in this case, the trial judge was charting his way through untested waters in a relatively new area as well. He's trying to balance the defendant's, he's trying to limit the prejudicial impact of any kind of testimony relative to his prior conviction, while allowing the evidence to come in for the state, so the state could properly establish how the defendant came to be identified as a source of the blood that was left behind in the victim's bathroom. There's no clear directive from existing case law and the appellate court even, in their opinion, conceded that the testimony by Lyle Boykin was brief, there was no evidence, reference or argument at any other point in that case to the defendant's criminal history. He struck a careful balance between allowing that brief evidence to be admitted while limiting any prejudicial, while limiting any prejudice to the defendant. It is our position that it was not an abuse of discretion. We would ask this court to reverse the trial, the appellate court's opinion and affirm the defendant's conviction. Thank you, counsel. Ms. Firebaugh, you may proceed. May it please the court, Carrie Firebaugh, on behalf of the appellee, Lewis Jackson. Ms. Firebaugh, just like I promised, I wanted you to respond to this as well. Is there anything outside of speculation for this court to look at other than the speculation of the defendant and the appellate court in this case, that jurors had a different understanding of fingerprint databases versus DNA databases? In fact, jurors from high-profile criminal trials, their exposure together with television crime shows, such as CSI, this has a monumental effect on raising the appellate's awareness of DNA's role in the criminal investigation process. The exoneration of wrongly convicted prisoners through DNA testing has also received extensive media coverage in recent years. All of this links DNA with crime and prior criminal conduct in the minds of the public. There was a study in the Yale Law Review that does indicate that fictional depictions of crime and the criminal justice process does have an effect on jurors' views of actual trials. Was that presented to the trial court and argued in the trial court? No, it was not. Did the defense make any attempt to present a special instruction? No. No, the defense counsel did not offer an instruction to the jury, and this would be because that offering a formal limiting instruction would have told the jury that somehow this evidence was relevant in this case. The jury should consider it to be relevant, and defense counsel made very clear that he did not consider this to be the case. A decision of strategy? Potentially, defense counsel believed that he didn't want to, after the trial court's decision to allow it in, didn't want to highlight it any further to the jurors. It's an important question, though, isn't it? Because if it is mere speculation and this court disagrees with the speculation, then there's not much difference between letting the jurors know that there's fingerprint evidence on file versus DNA evidence on file. I don't believe it's mere speculation. There was also another appellate court case in the First District that did state that jurors are generally aware that DNA databases are primarily used for the storage of convicted criminal profiles, unlike databases for photographs and fingerprints. Was there any suggestion of an evidentiary support of that conclusion from any case? There is no case law out there currently. Does the defendant have an obligation to object to the evidence? Well, the defense counsel did raise the issue prior to trial in a motion in limine, and also raised it after trial in the motion for new trial. So, other than that, I believe that's sufficient to show the court that he was objecting to the evidence. What do crime shows or otherwise indicate that fingerprint evidence is usually used for? What are these other sources that the jurors would be speculating as to what fingerprint evidence would be used for? Just based on their general life experience, their exposure to the crime television shows and their depiction of DNA as it's used in the criminal justice process. What do crime shows show that fingerprint evidence is used for? Well, the fingerprint cases seem to hold that jurors know that they're generally aware that they're used for a variety of non-criminal reasons, such as as well as photographs. Such as? Fingerprint evidence such as? Such as government employees, security personnel, and other things that people would know from their own life experience. Because the public's general perception of DNA is that it's collected by the police during their investigation of violent and sexual crimes, in recent years the public's general perception of DNA is that it's collected by the police during its investigation of violent and sexual crimes. In recent years, the use of DNA databases as a tool for solving crimes and for the storage of convicted criminals' profiles has also been highly publicized. As a result of this, when the jurors heard through the testimony of forensic scientist Boykin, who was an employee of the Illinois State Police, that Jackson's DNA was in the state's computer database, they would have concluded from this that Jackson had committed a prior crime. So you're saying this is presumptively prejudicial? I think that the jurors would have assumed, yes, from this evidence and the fact that it was given by an employee of the Illinois State Police. But did they know that? Yes. Boykin testified that he was employed with the Illinois State Police and that he was the one who initially uploaded the DNA, or the blood profile into the DNA database and determined that there was a match and then called down to the state to confirm that. As we previously discussed... Isn't that what would have happened had there been a fingerprint, though? It wouldn't have been a private person, it would have been a public employee of some type with a fingerprint. I'm sorry, I don't understand. You make the argument, and it's well phrased, that because there was a state policeman here who began the mention of the DNA database, there'd be an inference to be drawn that the database was a police database. My question was, wouldn't the same be true of fingerprints in a criminal case? Well, jurors, unlike DNA and DNA databases, jurors are generally aware from their own life experiences that they are used for reasons other than that. But I'm talking about the inference being drawn from the fact that a police officer is testifying. It would be the same in the fingerprint as well, wouldn't it? I don't believe that it would. That the person talking about fingerprints wouldn't be a policeman? Well, the person talking about the fingerprints would be... could be a policeman, yes. And then you could draw the inference from that that in this fingerprint case, it was a crime-based database because of the fact that the policeman was the one talking about it. Well, that was not the situation. In this case, we're talking about DNA being stored in a database. The state has placed great emphasis on the fact that the database contains several indexes that aren't criminally based. But the mere fact that these additional indexes exist does not mean the jurors are generally aware of their existence. Ms. Farbaugh, is there...I think it sounds to me like both you and the state concede there's nothing in the record that would support the speculation that the jurors know more or less about a database other than they may watch some crime programs, which uses databases of fingerprints and DNA. Is there a way to build a record in a case through voir dire of jurors as to what they know and what they speculate databases may be used for? Yes, there could...a question could be asked about their views on that topic. Unfortunately, that's not something that was done in this case. So we have nothing in the record other than your assertion that jurors know that DNA database is used for criminal purposes more so than fingerprints? Yes. And how do we review a record for abuse of discretion if there's nothing in the record to support that speculation? Well, I think that this court can review the standard of review can be de novo. So we aren't testing any of the facts or the witness's credibility. I think it's just common knowledge that because of jurors' life experiences which they definitely bring to the process, they would connect DNA primarily with crime and prior criminal conduct. Well, isn't it common knowledge also that many times if they find a body someplace they identify that person who's non-criminal through the use of DNA? I mean, isn't that...don't we hear that all the time on television too? I said don't we also hear on television all the time that if they find a body that's out in the woods or somewhere and it's maybe decayed and so forth and they make the identification through the use of DNA. And those aren't criminals. Don't we have taking buccal swabs of children so that in the event that children are kidnapped or missing that they can be identified? I mean, aren't those all non-criminal kind of applications of DNA that are well known and documented in the public? Those applications do have a criminal basis to them. You're talking about kidnappings and finding dead bodies. Not finding...somebody can have an accident and go out and they can't be identified you know, or for some kind of reason they're found dead somewhere and they go out to make the identification of who they are. And that's all done by DNA. I think that, well, the primary I think jurors primarily when they hear DNA do think of prior criminal conduct. And in this case it was especially true as I said before because an employee of the Illinois State Police was the one who gave the testimony. Let's just assume for the purposes of argument that the court disagrees that this is other crimes evidence. Then it comes down to basic relevance right? You're still saying that you've been prejudiced by the introduction of the DNA database, right? Yes. And I don't know that anybody disputes that it's prejudicial but if it's a relevant situation it's prejudice versus probative value, right? Correct. Isn't there tremendous probative value in this in that the state has to show why the investigation centered on defendant after six years? I mean isn't that tremendously probative as to why there's a focus on this defendant? This court has held that other crimes evidence Well I started, see, I started by saying if we disagree that this is other crimes evidence then it comes down to basic relevance. Pardon me. In those other cases, unlike the present case defendant was initially a suspect in the case. So jurors would not have been confused or speculated as to why he had been identified and charged with his answer six years after the offense. The jury heard that It's a pretty good gap though, isn't it? They focused on him and then six years later they, you know, bring him to trial. I mean that's a significant period of time. Six years is a significant period of time. But the jury, as I said, was aware that he was the initial and only suspect in this case. They were also aware that when Jackson was released several days later the detective was instructed to continue with the forensic investigation which included conducting the blood test. And they were aware that one month later the same detective went on leave and the forensic scientist's request for a sample to compare to the blood evidence at the crime scene went unanswered until six years later when the case file was found in the back of a closet in the detective division and the state finally made that request. All this information was before the jury. So they would have no reason to speculate as to why he had been identified and arrested six years later. Additionally in this case, Boykin's references to the database were unnecessary because he could have simply testified, as he also did at trial, that after obtaining the buccal swab directly from Jackson he compared his DNA profile to the DNA profile from the blood at the crime scene and determined that they were matched. The jury didn't need to know when the swab was taken or that the DNA was matched through the database, but only that it matched. Had the trial court deemed any reference to the database inadmissible the state wouldn't have been hindered in any legitimate way. Counselor, it's just where I want to go with what you just said. If in fact this trial had been had where there was no mention of any database, no mention of all of the defendant until you got him on trial and talked about the buccal swab but you don't indicate any way why the buccal swab was taken wouldn't that, if that was the state of the evidence in that trial, wouldn't that have been an area of fair comment by the defense counsel as to why the defendant, when they let somebody go six years ago and they now for unexplained reasons are bringing him back in again, argue that that somehow affects the credibility of the DNA evidence they have? No, because the jury was aware If you remember the start of my question, it probably wasn't that good, but wouldn't that have been an area for a legitimate area of defense counsel argument? But defense counsel wouldn't have needed to argue that in this case why the defendant out of all the people in the entire world was arrested for this offense because the jury was aware that he was the initial suspect and knew of all the evidence. I'm just saying that there could have been an argument crafted there. Suggesting letting him go was really what this case was all about. There was no more reason after they let him go to pick him up again. There could have been arguments that could have been made, probably more skillfully than I can, but still arguments that could have been made. Isn't that right? Arguments could have been made, but they weren't in this case. Well they weren't because there was evidence of how it happened. Right. Boykin's references to Jackson's inclusion in the DNA database were highly prejudicial to Jackson because Boykin's testimony was the last testimony that jurors heard  numerous times during its closing argument, even going so far as to tell the jury that DNA evidence alone proved Jackson's guilt and Boykin's testimony was the only thing they really needed to consider while they were deliberating. The state had to resort to these tactics due to the obvious weakness of its case, which was made up of a sloppy police investigation and circumstantial evidence that showed only that Jackson had the opportunity, but not that he had actually committed the offense. Most notably, the only new evidence obtained by the state six years after it had initially refused to bring charges against Jackson and released him from custody were the results of the DNA test, which merely revealed that two drops of Jackson's blood were in the bathroom of the apartment where he lived. Because the state failed to present any evidence to establish that this blood had been deposited at the time of the murder, it sheds no light on whether Jackson committed the offense. None of Jackson's blood was found in the bedroom where his aunt's body was discovered, nor on the murder weapon, despite testimony that he had cuts on his hands that day. Furthermore, in between the time of the offense and the time of the trial, numerous other pieces of potential evidence were either lost or never collected by the Harvey Police Department, and most of the pieces of evidence that were collected were not tested by the state. The cuts on the palms of Jackson's hand and the fact that he had keys to his aunt's apartment were insignificant because there was no indication that these cuts were fresh. Jackson also said that he only took the keys after finding his aunt murdered in the apartment, and the record shows that any number of other people could have had access to the apartment that day. In fact, Doris's own daughter testified that she often got into the building without having keys by simply having someone she knew let her in, and she even told the detective that this is something she had done on the day of the offense. In addition, John Simms, another witness, testified that his mother had moved out of the building several years before, and he still had her keys, which still worked in the locks because the locks of the building were never changed. Finally, Jackson never admitted to killing his aunt, and there was no evidence that he took the money or the television sets from the apartment, a fact that the state all but conceded during its initial oral argument in this case. Jackson was never found with money in his possession. No one saw him with the television sets, although many people saw him around the building that day, and neither the money nor the television sets were ever recovered. The appellate court was clearly troubled by this evidence. As it noted in its opinion, no less than four separate times that it was far from overwhelming. The fact that the jury sent out a note asking for transcripts further supports the conclusion. Jackson has maintained all along, as in issue two of his brief, that the evidence that was presented in this case was insufficient to prove his guilt beyond a reasonable doubt. At the very least, he was prejudiced by the introduction of this evidence. In such a close case, Boykin's testimony that Jackson's DNA was contained in the state's computer database only increased the risk that the jury would convict Jackson, not because the state had... in the evidence. It was a computer database in Springfield, which is a state database. I understand that, but the testimony wasn't a state database. It was a database. It was a database. As a result of the introduction of this testimony, Jackson was denied his right to a fair trial. Pursuant to issue one, Mr. Jackson respectfully requests that this court affirm the appellate court's decision that the trial court err by allowing the state to introduce evidence that his DNA was in the state computer database because it implied to the jury that he had committed other crimes, reverse his first degree murder conviction and sentence of natural life imprisonment, and remand this case for a new trial. Alternatively... Counsel? Yes. Your time is up. I apologize. Briefly, in rebuttal, your honors, I'd like to point out again that the standard overview is not de novo. The standard overview in this case is abuse of discretion because the trial judge had to decide whether or not this evidence came in and how it was to come in. So, de novo review is not appropriate here. As for the public's general awareness based on television shows and CSI and other sources of information, and all those other media sources for DNA out there, there's absolutely no support in the record in the present case that the jury was aware of any of those things. There was no indication from the voir dire that the jury was asked about those things and any presumption that the jury, because perhaps they watched a TV show or if not, there was not even any indication, no questions during voir dire what television shows the jury even watched. You cannot build a presumption from that that the jury would automatically presume that a database only had reference to a defendant having his DNA in a database would only have a criminal reason for that. With respect to the fact that there was no need for this testimony, clearly there was need for this testimony. It explained how, in fact, the defendant came to be identified so that a buckle swap could then be obtained. It was important to the case. The trial judge recognized that and he allowed that evidence in its limited fashion. And finally, as to the defendant's defense counsel's recitation of the evidence in this case, the jury was surprised and heard all these arguments and assessed all the evidence in this case and concluded that the evidence established the defendant's guilt beyond a reasonable doubt. The appellate court rightly, and in taking that evidence in the light most favorable to the prosecution, upheld that evidence as being sufficient to establish the defendant's guilt beyond a reasonable doubt. We would ask you once again to reverse the appellate court and affirm the defendant's conviction. Thank you. Case number 104-723 will be taken under advisement as agenda number 3.